IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS

DeAndre Crawford, (M30080),          )
                                     )
                Petitioner,          )
                                     )        Case No. 19 C 4949
        v.                           )
                                     )        Hon. Charles R. Norgle
                                     )
Dr. Deanna Brookhart, Warden,        )
Lawrence Correctional Center,        )
                                     )
                Respondent.          )

## MEMORANDUM OPINION AND ORDER

Petitioner DeAndre Crawford, a prisoner at the Lawrence Correctional Center, brings this

*pro se* habeas corpus action pursuant to 28 U.S.C. § 2254 challenging his 2012 first degree murder

and attempted murder convictions from the Circuit Court of Cook County.   The Court denies the

petition on the merits, and declines to issue a certificate of appealability.

I.    **Background**

The Court draws the following factual history from the state court record, (Dkt. 17.) and

state appellate court opinion in his postconviction case.   *Illinois v. Crawford*, Nos. 1-14-3712, 1-

15-2876, 2018 WL 1365436, at *1, *11 (Ill. App. Ct. Mar. 14, 2018).   State court factual findings,

including facts set forth in the state appellate court opinion, have a presumption of correctness,

and Petitioner has the burden of rebutting the presumption by clear and convincing evidence.   28

U.S.C § 2254(e)(1); *Tharpe v. Sellers*, 138 S. Ct. 545, 546 (2018); *Hartsfield v. Dorethy*, 949 F.3d

307, 309 n.1 (7th Cir. 2020) (citations omitted).   Petitioner has not made such a showing.

Petitioner was convicted of murdering his ex-girlfriend, Elana Anderson, and the attempted

murder of Anderson's then-current boyfriend, Ronald Harris.   *Crawford*, Nos. 1-14-3712, 1-15-

2876, 2018 WL 1365436, at *1, *11.   On February 12, 2008, at 9:44 a.m., the Chicago Police

Department received a 911 call. *Id.* at *3. The recording of the call that was played to the jury at trial was garbled and difficult to understand because the caller was in distress. *Id.* However, the caller can be heard saying "my boyfriend" and "shot me," and "I'm dying." *Id.* Harris, who testified at trial, identified Anderson's voice as the caller on the 911 tape. *Id.* at *4.

In response to the 911 call, two Chicago police officers entered Anderson's apartment building at 6722 South Halsted Street in Chicago to investigate. *Id.* at *2. The officers followed the smell of gunpowder in the building to a third-floor apartment where they discovered the door ajar. *Id.* They found Anderson on the living room couch bleeding from gunshot wounds to her right side. *Id.* She was flailing, screaming in pain, panicking, and asking for help. *Id.* at *3. Anderson told the officers that the shooter was "Deandre Crawford," "her oldest baby's daddy," and that Deandre had left the apartment through the rear door. *Id.* A later arriving officer came upon Anderson as she was being removed from the building by paramedics on a stretcher. This officer also asked Anderson what happened, to which she responded that Petitioner, her oldest son's father, had shot her. *Id.* This third officer stated that he did not talk to any other officers at the scene before speaking to Anderson. *Id.* A later autopsy determined that Anderson died from gunshot wounds to her right chest and breast. *Id.* at *8.

The two first arriving officers discovered the second victim, Harris, along with a small child in the apartment. *Id.* at *3. The child was sitting by Anderson unharmed, but Harris was in the backroom of the apartment lying on the floor not moving. *Id.* Harris, who was shot three times in his arm, once through his back, and twice through his mouth, survived the incident (although he is permanently disabled and unable to walk) and testified against Petitioner. *Id.* at *4.

2

Harris explained at the trial that he lived in the apartment with Anderson, Anderson's one-year-old toddler son, along with a two-month-old daughter that Harris had with Anderson. *Id.* In addition to these two children, Anderson had two other children who lived with her mother. *Id.* Harris had never met the fathers of these children. *Id.*

On the day of the shooting, Harris, who was the store manager of a Home Depot, had initially left to go to a work meeting in Algonquin, Illinois, a northwest suburb of Chicago. *Id.* His car got a flat tire on the way there, so he returned to the apartment to discover Anderson talking to a man he did not know. *Id.* Anderson and the man, who was wearing a dark peacoat, were talking about their child in a "calm but angry" conversation. *Id.* Harris excused himself to the apartment's back bedroom where he sat working at a computer. His two-month-old daughter was lying in a crib in the back bedroom. Anderson's one-year-old son was walking in and out of the bedroom. *Id.* Anderson walked into the bedroom followed by the man who said, "I'm leaving with my son and neither of you motherf*****s are going to do anything about it." *Id.* The man shot Harris. *Id.* Harris conceded that Anderson never introduced him to the shooter, and he did not get a good look at the assailant's face before being shot. *Id.* at *5. Harris was unable to identify the shooter in a later photo array presented to him by the police. *Id.* at *9.

Harris blacked out after being shot and awoke to find the police at the apartment. *Id.* at *4. He initially named either "Tony" or "Ernest" to the responding officers. *Id.* He also mentioned Tony while in the ambulance being taken to the hospital. *Id.* at *10. He clarified at trial that he did not know the shooter and mentioned both names for unrelated reasons. *Id.* at *4. Tony was a police officer who was Harris's family member. *Id.* Harris believed he kept

3

repeating Tony's name when the police discovered him because Tony was someone who could come and save him. *Id.* Harris affirmatively testified at trial that Tony was not the shooter. *Id.*

Harris conceded he had identified an "Ernest" as the shooter to the police after they found him shot. *Id.* However, he clarified at trial that he remembered that Anderson had Ernest tattooed on her leg and thought that might be the name of one of the fathers of Anderson's children. *Id.*

A police search of the crime scene recovered three .45 caliber fired bullets and five .45 caliber cartridge cases from one of the apartment's bedrooms. *Id.* at *6. A firearms expert later examined these recovered bullets and compared them to bullets found in Anderson's body during an autopsy and concluded all bullets were fired from the same gun. *Id.* at *8. The police searched the apartment for a gun but could not find one. *Id.* at *7.

Natasha Freeman, Petitioner's wife, testified that she, her six children, and Petitioner, along with another family, lived together in Ford Heights, Illinois. *Id.* at *8. The other family they lived with included Freeman's friend, Lyndette, who owned the home. *Id.* at *8, *9. Freeman explained that although Anderson had legal custody of the one-year-old boy that Petitioner had fathered with her, the boy had lived with Freeman and Petitioner in Ford Heights since he was two weeks old. *Id.* at *8. During the month of the shooting, Anderson had taken the boy to her apartment in Chicago for a few days so he could meet his new baby sister that Anderson had with Harris.

On the morning of the shooting, Freeman and Petitioner drove to Anderson's apartment building. *Id.* Petitioner went to the apartment while Freeman waited in Petitioner's car at a nearby Burger King parking lot. *Id.* at *9. Freeman explained that it was common for her and

4

Petitioner to drive to Anderson's apartment to visit, and their practice was for her to go somewhere to have coffee and wait. *Id.* at *8. However, Petitioner called her more quickly than normal on the day of the shooting and she picked him up a half block from the apartment. *Id.* at *9. The police investigation later located a video surveillance tape of the Burger King parking lot. *Id.* at *8. The video showed Petitioner's car in the parking lot from 9:20 to 9:50 a.m. on the morning of the shooting. *Id.* at *9.

Freeman confirmed that Petitioner was wearing a peacoat when he went into Anderson's apartment building and was still wearing the coat when she picked him up. *Id.* She explained that she did not see any blood on his coat, nor did he seem nervous, scared, or breathing heavily. *Id.* Freeman and Petitioner then drove to his mother's where they stayed for an hour and then returned home. *Id.* Freeman stayed at their home while Petitioner went to school. *Id.*

Petitioner then appeared unannounced at the home of Yolanda Horns sometime before 1:00 p.m. on the day of the shooting. *Id.* at *7. Petitioner's home where he had dropped off Freeman is approximately three miles from Horns'.[1] Horns knew Petitioner because Freeman was her best friend. *Id.* Petitioner asked to come in and use her bathroom and phone, and appeared "normal" and "calm." *Id.* Before leaving, he asked if Horns wanted his peacoat to which she said yes. *Id.* He brought the peacoat from the trunk of his car giving it to her. *Id.* Horns wore the coat to a dentist appointment later that day before cleaning the coat with a lint brush. *Id.* Horns then gave the coat to her son. *Id.* Horns stated that there was no blood on the coat when Petitioner gave it to her, and he did not have any blood on his hands when he appeared at her home. *Id.*

---

1 Horns lived at 2404 Saulk Trail, Saulk Village, Illinois, while Petitioner lived with Freeman and Lyndette's family at 1408 Park Lane, Ford Heights, Illinois. *Id.* at *5, *9. Google Maps states the homes are 3.1 miles apart. *See* shorturl.at/cglmA

Returning to the police investigation, a police sergeant arrived at the murder seen approximately 15 minutes after the officers responded to the 911 call. *Id.* at *5. The sergeant learned from the officers that Anderson identified Petitioner as the shooter. *Id.* He was able to locate Petitioner's phone number in a police database. *Id.* The sergeant called Petitioner and asked him to come to the police station. *Id.* Petitioner initially agreed but then called back 15 minutes later stating he had to attend class at Prairie State University that day. *Id.* The police then began to search for Petitioner in the area around Anderson's apartment building. The police would later arrest Petitioner at his home in Ford Heights at approximately 2:00 p.m. on the day of the shooting. *Id.*

A police detective contacted Horns the next day and she turned over to the police an Old Navy brand man's peacoat that Petitioner had given her along with the lint brush she had used on the coat. *Id.* at *6, *7. Subsequent forensic testing of the peacoat located Petitioner's DNA on the coat. *Id.* at *8. Gunshot residue was also found inside the coat's right hand front pocket. *Id.* at *7.

Approximately a month after the murder, the police were contacted by Marquita Powell. *Id.* at *6. Powell testified that Petitioner lived with her at her home in November 2007. *Id.* She stated that she gave Petitioner a navy blue peacoat from Old Navy for Christmas in December 2007. *Id.* at *7. Additionally, during this same period, she discovered that Petitioner had hidden a gun in her home.[2] *Id.* at *6. She hid the gun to hide it from her seven-year-old daughter who was living in the home, and refused to tell Petitioner where she put it. *Id.*

---

2 The state appellate court opinion states that Powell discovered the gun in her home in December 2008. However, this is clearly a typo as Powell's trial testimony stated the event occurred in December 2007. (Dkt. 17-14, pg. 1435.)

Petitioner and Powell drove to Anderson's apartment one day in December 2007 to see the boy. *Id.* Powell explained that no one answered the door when Petitioner knocked, and they remained outside the apartment for approximately an hour as Petitioner honked the car horn before leaving. *Id.* Petitioner demanded his gun that Powell had previously hidden with the intent of going back to Anderson's apartment to scare her. *Id.* Powell refused and Petitioner eventually calmed down. *Id.* According to Powell, Petitioner told her that he had custody of the child despite the boy not living with them. *Id.* A few weeks later, Petitioner showed Powell a document he created that he planned to use to demonstrate he had legal custody of the child. *Id.* at *7.

Approximately a month after the shooting, Powell received a letter from Petitioner asking her if she remembered the "nine" that had been in her home. *Id.* at *7. Powell understood this to be a reference to the nine-millimeter gun Petitioner brought into her home that she later hid. *Id.* The letter also asked Powell if she remembered the name of a lawyer Petitioner claimed to have previously hired for his custody case. *Id.* Powell contacted the police and turned over the letter. *Id.*

Petitioner's case-in-chief presented testimony from his mother who claimed that he and Freeman were with her at the time of the shooting. *Id.* at *10. According to his mother, the group had tea and hot cocoa while visiting at her home. *Id.*

Petitioner also attempted to present information to undermine Anderson's statements to the police identifying him as the shooter. *Id.* According to a Cook County medical examiner investigator's report, one of the investigating police detectives radioed on the day of the shooting that Anderson had recanted her identification of Petitioner as the shooter. *Id.* The medical

7

examiner investigator testified at trial that she had no independent recollection of the information contained in her report, but had no reason to doubt the report's accuracy. *Id.* The police detective named in the report testified at trial denying that he had said that Anderson recanted her identification. *Id.*

A 911 radio transmission was also played to the jury during the defense's case. *Id.* The radio call was by the Chicago police captain who responded to the crime scene at 10:00 a.m. on the day of the murder. *Id.* At 10:12 a.m., that day, the captain stated on the radio that Anderson had changed her story and the police were now looking for a "male black" "a big guy with a beard." *Id.* The police captain testified at trial that he did not know where the information came from that he related in the radio broadcast and he did not speak to either victim or the officers who spoke to the victims before making the broadcast. *Id.* He referred to the information on this point as "second or third hand." *Id.*

At the completion of the trial, the jury found Petitioner guilty of murder and attempted murder. *Id.* at 11. Petitioner was sentenced to 80 years of imprisonment. *Id.* He brought a direct appeal, but the parties agreed to a summary disposition of the appeal to correct his sentencing judgment to reflect the proper amount of presentence custody credit.[3] *Id.* at *11; (Dkt. 17-2.) The Supreme Court of Illinois denied Petitioner's petition for leave to appeal (PLA) ending his direct appeal. *Illinois v. Crawford*, No. 118508, 23 N.E.3d 1203 (Ill. Jan. 28, 2015) (Table).

Petitioner then brought a postconviction petition before the state court. *Crawford*, Nos. 1-14-3712, 1-15-2876, 2018 WL 1365436, at *11. The state trial court denied the petition and

---

3 Petitioner brought a *pro se* motion for leave to bring a supplement brief on direct appeal explaining that his appointed appellate attorney refused to raise the issues he sought to bring in the supplement. (Dkt. 17-3.) The state appellate court returned the motion to Petitioner as unfiled. (Dkt. 17-4.)

the appellate court affirmed. *Id.* at *12, *18. Petitioner's PLA was denied ending his postconviction proceedings. *Illinois v. Crawford*, No. 124040, 111 N.E.3d 956 (Ill. Nov. 28, 2018) (Table). Petitioner now brings the instant habeas corpus petition.[4] (Dkt. 1.)

## II.   Analysis

The habeas corpus petition alleges: (1) a *Miranda v. Arizona*, 384 U.S. 436 (1996), violation; (2) Petitioner's wife was wrongfully compelled to testify against him; (3) insufficient evidence supported the conviction; and (4) ineffective assistance of trial and appellate counsel.

### 1.   Claim One

Petitioner alleges that he was taken to the police station following his arrest on the day of the murder. He concedes that the police detectives properly advised him of his *Miranda* rights, but he refused to talk to the police and demanded to speak to a lawyer. The detectives allegedly returned every 30 to 45 minutes again asking Petitioner if he wanted to talk to them. Petitioner claims he repeatedly rebuffed their improper requests for 16 hours until he succumbed to their pressure and provided a statement to the detectives. Petitioner did not provide a confession and his statement was not introduced at trial. Instead, he claims he gave an alibi statement through which the detectives learned about Freeman and the peacoat. *Crawford*, Nos. 1-14-3712, 1-15-2876, 2018 WL 1365436, at *11. He argues the police's knowledge of Freeman and the peacoat are improper under the fruit of the poisonous tree doctrine.

The relevant state court decision for the Court's review is from the state postconviction

---

4 Petitioner states in the habeas corpus petition that he had a pending 735 ILCS 5/2-1401 petition before the state court challenging his sentence regarding a sentencing enhancement for personally discharging a firearm in the commission of the crime when he filed the instant case before this Court. (Dkt. 1, pg. 4.) Petitioner does not raise the personal discharge issue in the instant habeas corpus petition and does not seek a stay of these proceedings. The Court sees no reason to refrain from adjudicating the habeas corpus petition at this time because the personal discharge issue appears to be plainly meritless as the evidence at trial demonstrates that Petitioner did fire a gun when he murdered Anderson and severely wounded Harris. *Rhines v. Weber*, 544 U.S. 269, 277 (2005).

appellate ruling because that is the last state court to rule on the merits of Petitioner's claim. *Frentz v. Brown*, 876 F.3d 285, 293 (7th Cir. 2017). Petitioner's claim is governed by the requirements of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). To obtain relief, Petitioner must demonstrate that the state appellate court's rejection of his claim was either contrary to, or an unreasonable application of, clearly established federal law from the Supreme Court of the United States, or the state court decision is based upon an unreasonable determination of facts in light of the evidence before it. 28 U.S.C. § 2254(d). "The AEDPA's standard is intentionally 'difficult for Petitioner to meet.'" *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014); *Metrish v. Lancaster*, 569 U.S. 351, 358 (2013)). This "'highly deferential standard [] demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

The state appellate court rejected Petitioner's claim explaining that the fruit of the poisonous tree doctrine does not apply to *Miranda* based claims regarding evidence other than the defendant's statement. *Crawford*, Nos. 1-14-3712, 1-15-2876, 2018 WL 1365436, at *14. This is a correct statement of the law. *See United States v. Patane*, 542 U.S. 630, 641-42 (2004) (plurality opinion) (explaining that a *Miranda* violation occurs only when the improperly obtained statement is introduced at trial, and the "complete and sufficient remedy" for any *Miranda* violation is suppression of the statement) (internal quotation marks and citations omitted); *Oregon v. Elstad*, 470 U.S. 298, 304 (1985) ("The Fifth Amendment, of course, is not concerned with nontestimonial evidence.") Petitioner's statement to the police was not introduced at his trial so

there is no constitutional concern. The state court judgment is correct and so Petitioner cannot meet the demanding AEDPA standard.

Three housekeeping items deserve attention before concluding the evaluation of Claim One. First, the state appellate court applied an Illinois Supreme Court case in *Illinois v. Winsett*, 606 N.E.2d 1186 (Ill. 1992), in support of its decision that the fruit of the poisonous tree doctrine does not apply to a *Miranda* claim. The citing to a state case is permissible under the AEDPA because the state court need not cite to, or even be aware of, the controlling Supreme Court precedent as long as the state decision does not contradict the Supreme Court case law. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). The state court ruling in this case meets this standard.

Second, there is one questionable statement in the state court opinion, but it does not alter the outcome of this case. The state appellate court noted that Petitioner's statement to the police was not a confession or incriminating statement, but instead an attempt to establish an alibi. *Crawford*, Nos. 1-14-3712, 1-15-2876, 2018 WL 1365436, at *14. The state court opinion can be read as implying an additional ground to support the state court ruling that *Miranda* is not implicated because Petitioner did not confess to the police, but instead tried to exculpate himself by providing an alibi. *Miranda*, however, applies to any statement by the defendant introduced by the prosecution at trial regardless of whether it could be framed as incriminating or exculpatory because the prosecution's desire to use any statement in its case-in-chief makes it potentially incriminating by definition. *Rhode Island v. Innis*, 446 U.S. 291, 301 n.5 (1980) (citing *Miranda*, 384 U.S. at 476-77). The state appellate court opinion on this point appears at odds with *Miranda*.

However, any potential error by the state decision on this issue is irrelevant to the outcome in this case. That is because it is the state court's ultimate decision on Petitioner's claim, not its

11

reasoning, that is before this Court. *Harrington v. Richter*, 562 U.S. 86, 98 (2011); *Makiel v. Butler*, 782 F.3d 882, 906-07 (7th Cir. 2015). It is not the Court's place to evaluate the state court opinion like a professor reviewing a student's paper, or otherwise impose a mandatory opinion writing requirement on the state court. *Johnson v. Williams*, 568 U.S. 289, 300 (2013). All that is before the Court is the state court's "adjudication", i.e., its judgment. 28 U.S.C. § 2254(d). As explained above, there is no error in the state judgment rejecting Petitioner's claim because Petitioner's statement was not introduced at his trial and he has no right to the application of the fruit of the poisonous tree doctrine in a *Miranda* based claim.

Finally, for completeness purposes, the Court also points out the overwhelming evidence against Petitioner regardless of the *Miranda* fruit of the poisonous tree issue. Petitioner's view is that his alibi statement led the police to Freeman and, in turn, the coat. However, Petitioner presented an alibi defense at trial and Freeman was present at the home when Petitioner was arrested. *Crawford*, Nos. 1-14-3712, 1-15-2876, 2018 WL 1365436, at *5, *9. Both of these facts provide an alternative route through which the police would have had an independent discovery of the challenged evidence. *Sutton v. Pfister*, 834 F.3d 816, 821 (7th Cir. 2016).

Moreover, any issue with Freeman and the coat is irrelevant when viewing the overwhelming evidence of Petitioner's guilt as Anderson identified Petitioner as the shooter, and the Burger King video surveillance showed Petitioner's car was in the area at the time of the murder. *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Petitioner attempted to discredit Anderson's identifications at trial by claiming she recanted, but the jury rejected his argument when finding him guilty. The Court has no license to reexamine a jury's credibility

determinations. *Villavicencio-Serna v. Jackson*, 999 F.3d 496, 500-01 (7th Cir. 2021). Claim One is denied.

### 2. Claim Two

Petitioner next argues that his wife, Freeman, was wrongfully compelled to testify against him at trial in violation of spousal privilege. Freeman did not initially appear at trial despite being subpoenaed. *Crawford*, Nos. 1-14-3712, 1-15-2876, 2018 WL 1365436, at *8. She was arrested and appeared at trial while in police custody. *Id.*

Respondent is correct that the claim is procedurally defaulted. Petitioner attempted to raise the claim in his motion for permission for leave to file a supplemental brief before the state appellate court on direct appeal. (Dkt. 17-3, pg. 4.) The state court, however, denied Petitioner's request. (Dkt. 17-4). The state appellate court's denial of Petitioner's request to file a supplemental brief results in a default of the claim as an independent and adequate state ground of decision. *Clemons v. Pfister*, 845 F.3d 816, 820 (7th Cir. 2017). The only time Petitioner properly raised the claim to the state court was on his PLA on direct appeal, (Dkt. 17-5, pg. 7.) but raising a claim in the first instance in a PLA before the Supreme Court of Illinois does not preserve a claim for federal habeas corpus purposes. *Edwards v. Calloway*, No. 18 C 1574, 2020 WL 5630429, at *4 (N.D. Ill. Sept. 21, 2020).

Petitioner cannot excuse the default through either cause and prejudice or fundamental miscarriage of justice. Regarding cause and prejudice, cause is an "'objective factor, external to [Petitioner] that impeded his efforts to raise the claim in an earlier proceeding.'" *Weddington v. Zatecky*, 721 F.3d 456, 465 (7th Cir. 2013) (quoting *Smith v. McKee*, 596 F.3d 374, 382 (7th Cir. 2010)). Examples of cause include: (1) interference by officials making compliance impractical;

(2) the factual or legal basis was not reasonably available to counsel; or (3) ineffective assistance of counsel. *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007) (citing *McCleskey v. Zant*, 499 U.S. 467 (1991)). The first two grounds are inapplicable.

As to the third ground, Petitioner did exhaust his ineffective assistance of counsel claim regarding counsel's alleged failure to raise the *Miranda* issue discussed in Claim One, (Dkt. 17-7, pg. 4; 17-11, pg. 26.) but that ineffective assistance of counsel argument does not excuse the default of the instant claim. An ineffective assistance of counsel argument asserted to excuse a default must, itself, be properly preserved in the state courts. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Smith v. Gaetz*, 565 F.3d 346, 352 (7th Cir. 2009). Although ineffective assistance of counsel is a single claim, *Pole v. Randolph*, 570 F.3d 922, 934 (7th Cir. 2009) (citing *Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005)), Petitioner must raise the particular factual basis for each aspect of the alleged ineffective assistance of counsel allegation to preserve the respective argument. *Pole*, 570 F.3d at 935 (citing *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007)). "A bare mention of ineffective assistance of counsel is not sufficient to avoid a procedural default; [Petitioner] must have 'identified the specific acts or omissions of counsel that form the basis for [his] claim of ineffective assistance.'" *Johnson v. Hulett*, 574 F.3d 428, 432 (7th Cir. 2009) (quoting *Momient-El v. DeTella*, 118 F.3d 535, 541 (7th Cir. 1997)). "Petitioner cannot argue one theory [of ineffective assistance of counsel] to the state courts and another theory, based on different facts, to the federal court." *Johnson*, 574 F.3d at 432 (citing *Everett v. Barnett*, 162 F.3d 498, 502 (7th Cir. 1998)). Petitioner cannot demonstrate cause and prejudice to excuse the procedural default under these circumstances.

14

This leaves the fundamental miscarriage of justice (actual innocence) gateway to excuse Petitioner's defaults. To show actual innocence to defeat a default, Petitioner must demonstrate that "'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). This is a "demanding" and "seldom met" standard. *McQuiggin*, 569 U.S. at 386 (citing *House v. Bell*, 547 U.S. 518, 538 (2006)). Petitioner must present new, reliable evidence that was not presented at trial --- such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence --- to make a credible claim of actual innocence. *House*, 547 U.S. at 537 (citing *Schlup*, 513 U.S. at 324); *see McDonald v. Lemke*, 737 F.3d 476, 483-84 (7th Cir. 2013) (quoting *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("[A]dequate evidence is 'documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who places him out of the city, with credit card slips, photographs, and phone logs to back up the claim.'")). As discussed above, the evidence of Petitioner's guilt is overwhelming so he cannot demonstrate actual innocence. Claim Two is procedurally defaulted.

For completeness purposes, the Court notes Claim Two is also meritless in addition to being defaulted. A prisoner cannot obtain habeas corpus relief based on a violation of state law unless he can demonstrate that a state evidentiary error was so great that it infused the trial with unfairness so as to violate due process. *Estelle v. McQuire*, 502 U.S. 62, 67-68, 75 (1991); *Corcoran v. Wilson*, 651 F.3d 611, 613 (7th Cir. 2011) (per curiam).

The common law recognizes two aspects of spousal privilege: (1) a spouse cannot be compelled to testify against a fellow spouse; and (2) preventing the disclosure of confidential communications between the spouses occurring during the marriage. *Tabor v. City of Chicago*,

15

No. 2015 IL App (1st) 133742-U, 2014 WL 6686647, at *3 (Ill. App. Ct. Nov. 26, 2014) (citing *Trammel v. United States*, 445 U.S. 40, 44 (1980)). The privilege is a creature of common law, there is no federal constitutional right to a spousal privilege. *Trammel*, 445 U.S. at 44; *Simpson v. Neal*, 746 F. Supp. 780, 794 (N.D. Ill. 1990). Illinois, however, limits the privilege to only protect against the disclosure of spousal communications. *Tabor*, No. 2015 IL App (1st) 133742-U, 2014 WL 6686647, at *3. There is no prohibition against a spouse being compelled to testify against a fellow spouse. *Id.*

Petitioner's argument that Freeman could not be forced to testify against him is incorrect because that portion of the privilege does not exist in Illinois. Additionally, the privilege that does exist in Illinois of protecting communication occurring between spouses during a marriage is inapplicable to Petitioner's case. Freeman married Petitioner in 2009 but testified to events from 2008 prior to the marriage. *Crawford*, Nos. 1-14-3712, 1-15-2876, 2018 WL 1365436, at *8. There is no error in Freeman testifying at trial, and so Petitioner cannot demonstrate an error so egregious as to violate due process. Finally, beyond there being no error, any alleged error would be harmless in light of the overwhelming evidence of Petitioner's guilt. *Brecht*, 507 U.S. at 624.

### 3.    Claim Three

Petitioner challenges the sufficiency of the evidence supporting his conviction. Like the spousal privilege issue raised in Claim Two, this claim is also procedurally defaulted. The procedural default analysis for this claim is identical to the above analysis from Claim Two. Petitioner improperly attempted to raise the issue in his motion to file a supplemental brief on direct appeal that was rejected by the state appellate court. (Dkt. 17-3, pg. 5.) He then raised the claim in his PLA on direct appeal. (Dkt. 17-5, pgs. 7-8.) As explained in Claim Two, the state

16

appellate court's rejection of the supplemental brief results in an adequate and independent state ground of decision. *Clemons*, 845 F.3d at 820. Additionally, as discussed above, Petitioner raising a claim to the state supreme court in the PLA in the first instance does not preserve a claim for federal habeas corpus purposes. *Edwards*, No. 18 C 1574, at *4 (N.D. Ill. Sept. 21, 2020). Finally, consistent with the analysis in Claim Two, Petitioner cannot excuse his default through cause and prejudice or fundamental miscarriage of justice. This claim is procedurally defaulted.

Beyond the default, the claim is also meritless. In reviewing the sufficiency of the evidence, "'it is the responsibility of the [finder of fact] --- not the court --- to decide what conclusions should be drawn from evidence admitted at trial.'" *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (per curiam) (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam)). "The evidence is sufficient to support a conviction whenever, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Parker*, 567 U.S. at 43 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original).

There is overwhelming evidence of Petitioner's guilt. Prior to her death, Anderson told multiple police officers that Petitioner shot her. Harris explained that the shooter was wearing a peacoat and Petitioner was discovered later giving his peacoat away, with gunshot residue on it, just hours after the shooting. Freeman placed Petitioner at Anderson's apartment at the time of the shooting and the Burger King parking lot video also showed Petitioner's car at the scene at that time. The evidence also showed that Petitioner was in a custody dispute with Anderson over their son and he had a practice of going to her apartment to argue about the issue including wanting to threaten her with a gun on a prior occasion.

17

Petitioner counters that Anderson recanted her identification and Harris mentioned other names to the police. But, these arguments were presented to, and rejected by, the jury. The Court, when viewing the evidence in the light most favorable to the prosecution as required, has no license to reject the jury's weighing of the evidence on these issues when it found Petitioner guilty. There is sufficient evidence to support Petitioner's convictions. Claim Three is denied.

### 4. Claim Four

Petitioner's final claim is that his trial lawyer was ineffective for failing to raise the *Miranda* issue asserted in Claim One, and his appellate attorney was ineffective on direct appeal for failing to raise: the *Miranda* issue, his trial lawyer's ineffective for failing to raise the *Miranda* issue, and the spousal privilege issue asserted in Claim Two. Petitioner raised the ineffective assistance of trial counsel claim on direct appeal only as to counsel's failure to raise the *Miranda* issue previously discussed in Claim One. (Dkt. 17-7, pgs. 42-43.) The ineffective assistance of counsel as to the failure to raise the spousal privilege issue was not exhausted. However, Respondent does not raise a procedural default argument on this point. *See Cheeks v. Gaetz*, 571 F.3d 680, 686 (7th Cir. 2009) (explaining that procedural default is an affirmative defense subject to forfeiture).

An ineffective assistance of counsel argument is governed by *Strickland v. Washington*, 466 U.S. 668 (1984). To demonstrate ineffective assistance of counsel, Petitioner must show both deficient performance and prejudice. *Premo v. Moore*, 562 U.S. 115, 121 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)). The court's review under *Strickland* is deferential. *Knowles*, 556 U.S. at 123.

18

Traditionally, state court decisions are reviewed under the requirements of the AEDPA, which requires a level of deference. 28 U.S.C. § 2254(d). The result is that this court affords a double level of deference to the state court decision as the AEDPA deference is stacked upon *Strickland's*. *Id*.

This case, however, partially deviates from the traditional framework, because the state appellate court rejected the *Strickland* claim as to the alleged ineffective assistance of counsel on the *Miranda* issue, but the ineffective assistance of counsel as to the spousal privilege was not raised to the state court. *Crawford*, Nos. 1-14-3712, 1-15-2876, 2018 WL 1365436, at *16-*17. The AEDPA applies only when there is an adjudication on the merits. *Harris v. Thompson*, 698 F.3d 609, 623 (7th Cir. 2012). As a result, the Court applies the pre-AEDPA standard to the ineffective assistance of counsel issue regarding spousal privilege, while the deferential AEDPA standard controls the *Miranda* ineffective of assistance of counsel issue. *Myers v. Neal*, 975 F.3d 611, 620-21 (7th Cir. 2020) (citing *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)). The pre-AEDPA standard is a *de novo* review under 28 U.S.C. § 2243 in which the court addresses the issue as law and justice require. *Harris*, 698 F.3d at 623.

Petitioner's ineffective assistance of counsel arguments are meritless. As explained in Claims One and Two, his underlying *Miranda* and spousal privilege arguments are meritless and so counsel cannot be faulted for failing to raise these arguments. *Carrion v. Butler*, 835 F.3d 764, 779 (7th Cir. 2016). Furthermore, Petitioner cannot demonstrate prejudice because, a previously discussed, the evidence of his guilt is overwhelming. Claim Four is denied.

The habeas corpus petition is denied on the merits.

## III.    Certificate of Appealability and Notice of Appeal Rights

The Court declines to issue a certificate of appealability. Petitioner cannot make a substantial showing of the denial of a constitutional right; i.e., reasonable jurists would not debate, much less disagree, with this Court's resolution of Petitioner's claims. *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

Petitioner is advised that this is a final decision ending his case in this Court. If Petitioner wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). Petitioner need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if Petitioner wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

**IV.    Conclusion**

Petitioner's habeas corpus petition (Dkt. 1.) is denied on the merits.    Any other pending motions are denied as moot.    The Court declines to issue a certificate of appealability.    The Clerk is instructed to enter a Rule 58 judgment in favor of Respondent and against Petitioner.    Civil Case Terminated.

ENTERED: 10-1-21

Dated:

CHARLES R. NORGLE
United States District Judge

21